In the Matter of the Judicial Settlement of the Account of PHILANDER H. OAKLEY, Trustee under the Last Will and Testament of EMMA H. POLLOCK, Deceased.

Surrogate's Court, Kings County, April 19, 1929.

*Ernest M. Garbe*, for the petitioner Philander H. Oakley.

*Caldwell & Raymond*, for Arthur R. Pollock.

*Field & Field*, for Margaret Hanscom.

*Holm, Whitlock & Scarff*, for Emma M. Oakley.

*Emil N. Baar*, special guardian.

WINGATE, S. This proceeding was instituted by the petition of Margaret Hanscom, a contingent remainderwoman under the will of her grandmother, Emma H. Pollock, for a compulsory accounting by the surviving trustee under the will. The trustee had filed a voluntary accounting in 1920, to which no objection had at that time been interposed, but no decree was entered thereon, and, upon motion, the two proceedings were consolidated. Finally, the accounting of Emma M. Oakley, the executrix of George W. Oakley, a deceased trustee, was consolidated with the other two proceedings, thus bringing before the court the administration of the trust from the time when the corpus was turned over to the trustees by themselves as executors, in 1892, to the present.

As originally filed, six bases of objection to the accounts of the trustees were alleged. In substance, these were:

*First.* That the surviving trustee borrowed money from the estate at four per cent interest, the loan remaining outstanding for thirty years, during which time normal interest rates were higher; that his payments of interest on such loan were irregular and some were never made and that, as a result, he was indebted to the estate in the sum of $8,000.

*Second.* That the trustees sold certain real property in their hands, namely, 315 Carlton avenue, Brooklyn, and with the proceeds purchased property at Crestwood, N. Y., taking title in the name of the life tenant, by which $11,000 was lost to the estate.

*Third.* That the trustees made loans to the life tenant, Arthur R. Pollock, in undisclosed amounts; that his interest payments were irregular and some were never made, and that the trustees permitted his occupancy of real property belonging to the estate at an inadequate rental; that the payments of rental were irregular and no interest was charged on overdue sums; in consequence of which large amounts were lost to the estate.

*Fourth.* That the trustees improperly paid the sum of $5,000 to the life tenant from principal.

*Fifth.* That the trustees made an illegal investment in Denver, Colo., which resulted in serious loss to the estate.

*Sixth.* That the trustees made an unjustifiable payment of $1,000 to one C. A. Hitchcock.

Upon the hearing the attorney for the objector abandoned the first three objections to the account, his statement in this connection being found at pages 69 to 71 of the record. Although he attempted in his memorandum, submitted after the close of the hearing, again to raise certain of these objections, his concession has estopped him from so doing, since it may be inferred that his action influenced the manner of conduct of the hearing on behalf of the trustee. Furthermore, since the will, as hereinafter more fully appears, expressly gave all income with a right to invade principal, to the life tenant, who not only made no objection to these items but expressly approved all of the acts of the trustees, the first and third objections had no conceivable merit in any event; and since the Crestwood transaction yielded a profit to the estate, any objection thereto was equally unfounded.

The contestant, on the hearing, also claimed that the trustee was subject to surcharge by reason of penalties incurred in consequence of his failure to deposit certain bonds and make certain payments within the required time. Although this claim was not included in the original objections, it was conceded by the attorney for the trustee that the latter was liable to surcharge in this connection in the sum of $450. Certain additional claims, not included

in the original objections, were advanced in the course of the hearing, but these were not conceded and the testimony is insufficient to warrant a finding of liability on the part of the trustee in connection with them.

This brings us directly to the three chief matters at issue in the proceeding, which are embraced in the fourth, fifth and sixth items of the objections. Before specifically reviewing the testimony on these points, it will be necessary to consider some of the general facts surrounding the estate.

Emma H. Pollock, the testatrix, died in or about the year 1891, leaving a last will and testament which was duly admitted to probate in this court.

This will, so far as it is material for the determination of the questions raised, left a life estate in the total fund here involved for her only child, Arthur R. Pollock, who had been totally blind since infancy, with remainder to his issue, if any, and, in default thereof, to certain specified collateral relations or their heirs.

The will also contains the following clauses:

" In case said Trustees should in the exercise of their judgment and discretion, deem and determine that the proper care, education, attendance, maintenance and support of my said son should at any time during his life require and make necessary the expenditure of more than said income, then I authorize and direct said Trustees to use and expend so much of the principal of my said estate as shall, taken with said income, be adequate and sufficient for the proper care, education, atterdance, maintenance and support of my said son.

" * * * I do hereby authorize and empower said Trustees to sell and convey all or any part of my real estate at such times, on such terms, and for such prices as to them shall seem best, and invest and re-invest the funds and moneys belonging to my said estate in such ways and securities as to them shall seem wise and discreet."

The testatrix appointed her two brothers as executors and trustees. They both qualified and served jointly until one of them, George W. Oakley, died in April, 1920, since which time the accountant in this proceeding has served alone. The life tenant, Arthur R. Pollock, is still alive, and the objections are filed on behalf of his daughter.

Of the three objections still remaining open for determination, the sixth, referring to the sum of $1,000 paid to C. A. Hitchcock, is capable of ready disposition. Mr. Hitchcock was the attorney for the trustee on the accounting proceeding in 1920. The payment was made in good faith by the accountant for services rendered

in the preparation and submission of that account. The account was a long and involved one, covering a multiplicity of transactions over a period of about thirty years. This work was, no doubt, rendered more difficult by reason of the intervening death of the accountant's cotrustee who appears to have had the more intimate contact with the active management of the estate during his lifetime. The payment was made upon the mistaken understanding of the trustee that his account had been judicially settled, which assurance was given him by such attorney, now deceased, and was made in good faith for a legitimate administration expense and was reasonable in amount on the facts and conditions existing. This objection is, therefore, overruled.

The fifth objection relates to a loan of $10,000 on first mortgage on certain property in Denver, Colo. The language of the will granting the trustees authority to make investments other than in conformity with the strict legal requirements of this State, has been noted.

The facts respecting this investment appear from the record to have been that the son-in-law of the deceased trustee, a Mr. Murray, had settled in Denver. Mr. Murray had previously been an attorney-at-law in Brooklyn, N. Y., and as such apparently enjoyed the confidence of Mr. Oakley. He had been obliged to go to Colorado for his health and previous to the time when this unfortunate investment was made had suggested a number of other similar first mortgage investments on the security of Denver real estate, which had been entirely satisfactory. The particular transaction here in question was a first mortgage of $10,000 on an improved parcel of real estate, which was described in the testimony as a fine house on a corner lot, appraised at $20,000 and on which a Denver bank had loaned the sum of $4,000 on second mortgage. The explanation made by the trustee for going outside of New York for such investments was that they were able to secure a higher rate of interest in Denver than they could have obtained in the vicinity of New York. He testified to considerable inquiry as to rates of return in New York on similar securities at that time and that he was informed that similar rates could not be obtained here. Whatever the actual fact, on which there seems to be some doubt, it is not seriously open to question from the manner and content of the testimony but that the trustees were honestly convinced that this was so. The investment proved satisfactory for a time, but the mortgagor later defaulted, and the trustees apparently concluding that such a course was for the best interests of the estate, took an absolute, unincumbered title to the property in satisfaction of the mortgage. The property proved difficult to

sell or rent and a heavy loss was incurred in upkeep and carrying charges. It was finally sold for $9,500, less sales commissions, a net loss of $852.50 exclusive of such upkeep and carrying charges.

A vast amount of testimony was introduced at the hearing relative to the efforts of the trustees to rescue the estate from its unfortunate predicament. All of this testimony appears irrelevant and immaterial in view of the statement of the attorney for the objectant at page 122 of the record: " I am not claiming they did not do the best they could to get themselves out." It is further largely immaterial for the reason that a considerable portion of the loss was loss of income which was the sole property of the life tenant, and he, as hereinbefore noted, not only failed to object to the account of the trustee, but expressly approved of his acts.

The real question respecting this Denver transaction, therefore, is as to the propriety of the investment by the trustees in the first instance, in which connection a review of some of the basic principles applicable to such matters may be of advantage.

In *McCabe* v. *Fowler* (84 N. Y. 314) the Court of Appeals says (at p. 318): " An executor or trustee is not a guarantor for the safety of the securities which are committed to his charge, and does not warrant such safety under any and all circumstances, and against all contingencies, accidents or misfortunes. The true rule which should govern his conduct is, that he is bound to employ such prudence and such diligence in the care and management of the estate or property as in general prudent men of discretion and intelligence employ in their own like affairs. * * * While this rule requires an executor or trustee to avoid all extraordinary risks in the investment of the moneys of the estate and to keep the same safely, it does not demand that he shall be made liable for contingencies which, under ordinary circumstances, could not have been anticipated."

In *Crabb* v. *Young* (92 N. Y. 56) the court says (at p. 66): " But while trustees are thus held to great strictness in their dealings with the interests of their beneficiaries, the court will regard them leniently when it appears they have acted in good faith, and if no improper motive can be attributed to them, the court have even excused an apparent breach of trust, unless the negligence is very gross. * * * "

An application of this general rule in the Appellate Division of this Department is found in *Matter of Hurlbut* (210 App. Div. 456) where the court says (at p. 458): " I think it is conceded that where such a clause is found, clothing a trustee with discretion, he is answerable only when he has not acted in good faith and used the care and diligence in investments which would be exercised

by a reasonably careful and prudent person. The question, therefore, becomes one essentially of fact, namely, did the executor act in good faith, and did he use that degree of care and diligence which we would expect from one circumstanced as was the executor, charged with the execution of a trust, in which the rights of infants were involved."

How shall the principles of these cases be applied to the present facts?

It is apparent from the provisions of the will and the affliction of the only child of the testatrix, to whose welfare substantially the entire estate, both income and principal, if necessary, was dedicated, that the chief aim of testatrix was the care for her boy when she was no longer able to care for him herself. This care she transferred to his uncles, her brothers. Realizing that this care, in view of his terrible disability, would be expensive, she clothed his nearest and presumably most interested relatives with such powers as would enable them to go outside the limited class of strictly trust investments in order to try to obtain a larger income yield than could be obtained from the more limited investments of the strict trust class. That in all their dealings they acted in the strictest good faith cannot be open to serious question, and in this connection, at least, does not appear to be doubted. Did they act with ordinary prudence in this investment, within the rule above considered? In answering this question, we must look at the situation as it appeared to the trustees at the time of investing this money.

The investment was a first mortgage on improved real estate, described as a large and attractive house on a corner lot. The amount of the loan was $10,000; the appraised value of the property was $20,000. Additional evidence of such value was furnished by the fact that a financial institution of the locality where the property was situated had taken a subordinate lien on the same property in the sum of $4,000, forty per cent of the amount of the loan, the making of which was being considered by the trustees. On such a showing of facts, this particular mortgage would have been within the strict legal rule of trust investments had the property been located in the State of New York (Pers. Prop. Law, § 21, as amd. by Laws of 1928, chap. 362).

Does the fact that the property was located in another State change into negligence, within the decisions, that which would have been a strictly legal act to a trustee not vested with the discretion which these trustees possessed, had the property been located here?

The trustees were in touch with a man on the ground whom

they knew well and in whom they had confidence, an attorney of this State, who they might naturally expect would protect them in consequence of family ties as well as on account of the ethics of his profession. No matter where they invested the moneys of the estate, they would have been obliged in a substantially equal degree to rely upon the advice of an expert in such matters, and it may well have been that nowhere was there a person in whose judgment they had, or had a right to have, greater confidence. Previous investments in the same locality had resulted advantageously, and so far as the trustees could see, or as could have been seen by any man in their position at the time, there was every reason to suppose that a like result would be achieved by this investment. They were convinced that a higher rate of return could be obtained on like security in Denver than in New York and they were under a moral obligation to see to it that the highest return reasonably attainable should be secured. They made inquiry as to returns in New York and were informed that a like interest rate was not here available. The statement by one individual in a letter introduced into the record to the contrary is not convincing of the fact that securities in an amount desired were at the time readily available here; but even if they were, the entire showing falls far short of demonstrating that the trustees, in this instance, can be held to have failed to use " the care and diligence in investments which would be exercised by a reasonably careful and prudent person " within the language of *Matter of Hurlbut* (*supra*), which would warrant this court in surcharging them with the loss which eventuated. This objection is, therefore, overruled.

There remains for consideration the objection designated " Fourth," relating to the principal payment to the beneficiary of $5,000 on February 5, 1925.

Considerable evidence was introduced to the effect that this was reimbursement for sums expended by the life tenant for repairs to his house at Crestwood; but on the whole record the conclusion seems inescapable that this explanation was an afterthought. The real purpose of the payment would seem unquestionably to be established by the 2d paragraph of the letter of January 25, 1925, from the life tenant to the trustee which was introduced in evidence as respondent's Exhibit 6. This paragraph reads as follows: " The idea has occurred to me that it would be a good scheme for you to send me $7,500 and I check it back to the estate and let same apply toward the paying off of the mortgage on this place. I can see no other way in which I can reduce it at the present time, and should anything happen to me, it would

give Net some real equity in the property. As Majorie is the only heir, I know her to be in favor of this procedure, and if you so desire, she will write you to that effect, which would certainly protect you from future criticism. The estate would not loose any real money by this financing until the actual settlement of the trust fund which of course would be at my death. Give this matter your thought and advise your decision on same."

The "Net" referred to was the life tenant's second wife. Marjorie was his daughter by a former marriage and is the one filing the objections in this proceeding.

Eleven days after the date of this letter, namely, on February 5, 1925, the trustee paid the life tenant $5,000 on account of principal; and eight days thereafter, on February 13, 1925, the life tenant paid the trustee $5,000 as a payment on account of the principal of the mortgage held by the estate on his Crestwood realty. The conclusion is obvious, therefore, that the payment of this principal amount by the trustee to the life tenant was not for the "proper care, education, attendance, maintenance and support" of the life tenant, which were the only purposes for which the trustees were given the right to invade the principal by the terms of the will, but that the entire plan and object of such payment was to increase the individual estate of the life tenant for the ultimate benefit of his wife and at the ultimate expense of the remaindermen who might be entitled upon the death of the life tenant. To state the transaction is to demonstrate its unjustifiable nature under the terms of the will.

The trustee seeks to avoid surcharge for this item by an attempt to show that the daughter of the life tenant was consulted prior to the making of this payment and consented thereto; but such a demonstration could not, under the facts presented, relieve the trustee from the necessity of making good to the estate the amount thus diverted from its assets, since there is no assurance that the objector will be the sole remainderman, or, indeed, that her interest in the remainder will ever come into her possession.

Under the terms of the will, upon the death of the life tenant the principal is to be paid to his issue him surviving, and in default thereof it is to be divided among some thirteen or more collaterals or their descendants. Should Mrs. Hanscom predecease the life tenant or should he have other children, Mrs. Hanscom's remainder under the will would either be wholly extinguished or be reduced, depending on the particular events which might transpire. Obviously, her act could in no way be decisive as a waiver of the possible rights of these other contingent remaindermen.

On the other hand, it is more than conceivable that, had it not

been for her act, this $5,000 payment would never have been made, and the legal effect of her conduct should be considered.

It appears that Mrs. Hanscom called upon her father, the life tenant, during the latter part of January, 1925, at which time the payment of this $5,000 on principal account to him was fully discussed. The testimony of the life tenant on this subject, which was largely corroborated by Mrs. Pollock, was clear and explicit. His evidence was as follows: " I told her the situation, how we were falling behind all the time, and I asked her if she had any objection to the trustee doing it, and she said she would be perfectly glad to do anything she could to get me out of the situation I was in. * * * Q. Did you tell her you had requested an advance of $5,000 from the surviving trustee? A. I did. Q. What did you say to her at that time about the advance? A. Why, I told her it was a reimbursement to help me out of a bad situation and also helped the house out of a bad situation in the way of taxes and so forth. She said she understood exactly how it was and was perfectly satisfied that it should be that way and I could do anything; she would be glad to do anything to have it that way."

The life tenant thereupon advised the trustee that his daughter had consented, and thereafter, as we have seen, the money was paid over.

Had such assent by Mrs. Hanscom been induced by a truthful statement of the purpose of the payment, it would seem difficult to escape the conclusion that Mrs. Hanscom, personally, would have been estopped to object to the payment. (*Rothschild* v. *Title Guarantee & Trust Co.*, 204 N. Y. 458, 464; *Voorhis* v. *Olmstead*, 66 id. 113, 118; *L'Amoreux* v. *Vischer*, 2 id. 278, 281.) But, as we have seen, this was not done. The real purpose of the life tenant's application for the principal payment was to build up an estate for his second wife at the expense of his daughter, and since his daughter's assent to the arrangement was predicated upon an untruthful representation of the purpose of the payment, a court of equitable jurisdiction will not invoke an equitable principle to bar her from objecting to the transaction.

The final results may, therefore, be summarized as follows: The first, second and third objections were abandoned; the fifth and sixth objections are overruled; the fourth objection is sustained and the account of the trustee is surcharged in the sum of $5,000; his account is further surcharged with the sum of $450, penalties incurred by reason of defaults of the trustee, as stipulated at the hearing.

Settle decree accordingly, on notice.